IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-01508-NYW

MARIE D. ANDERSON,

      Plaintiff,

v.

GUARANTY BANK AND TRUST CO.,

      Defendant.

---

# ORDER AND OPINION

---

Magistrate Judge Nina Y. Wang

      This matter comes before the court on Defendant Guaranty Bank and Trust Co.'s (the "Bank") Motion for Summary Judgment. [#32, filed June 23, 2015]. This court has carefully considered the Motion and related briefing, the entire case file, and the applicable case law. For the following reasons, I GRANT the Bank's Motion for Summary Judgment.

## PROECEDURAL BACKGROUND

      Plaintiff Marie D. Anderson ("Ms. Anderson" or "Plaintiff") initiated this action as a *pro se* litigant on May 30, 2014, asserting federal claims of discrimination on account of age and disability under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 12101, *et seq.*, and Americans with Disabilities Act ("ADA"), 42 U.S.C. 12101, *et seq.* [#1]. Plaintiff seeks damages in the amount of $473,200.00. [#1 at 3].[1] On May 30, 2014, Plaintiff filed a motion for leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915, which the court granted on June 3, 2014. [#3, #4]. On June 18, 2015, Plaintiff filed a motion requesting the

appointment of counsel, which the court denied on July 8, 2014 on a variety of bases.  [#10, *see* #11].

The following facts are drawn from the Complaint.  On November 24, 2009, Ms. Anderson took a leave of absence from the Bank due to a long-term disability.  [#1 at 7].  On April 12, 2010, she returned to work with a medical restriction of needing to elevate her right leg 75 percent of the work day.  *Id.*  Plaintiff requested a sit-down work station, which she represents would have allowed her to comply with the restriction.  *Id.*  Ms. Anderson concedes that the Bank accommodated her disability, but alleges that the accommodation the Bank provided did not allow her to elevate her right leg as often as 75 percent of the day.  *Id.*

In September 2012, Ms. Anderson, in her role as Operations Specialist, observed that two tellers had neglected to close the cash vault at the branch where she worked.  [#1 at 7].  She admonished them that such a mistake could not happen again.  *Id.*  Plaintiff then arranged to have the armored service delivering cash to that branch ("Loomis") call ahead one hour prior to its arrival.  *Id.*  On October 4, 2012, Plaintiff, along with the Branch Operations Manager and Branch Sales Manager, observed that the cash vault was again impermissibly open.  Ms. Anderson informed the Managers about the occurrence of an open vault the previous month, and "what steps [she] had taken to correct it."  *Id.*  On October 15, 2012, Ms. Anderson was terminated from her position at the Bank, and her superiors specified that she was discharged for failing to inform them of the open vault in September.  [#1 at 6].

The Bank filed an Answer to the Complaint on August 7, 2014.  [#12].  On October 28, 2014, the Parties consented to the jurisdiction of a United States magistrate judge.  [#21].  The case was subsequently referred to Magistrate Judge Boland for all purposes pursuant to 28

---

[1] The court uses this designation to refer to the ECF document number and the page number of

U.S.C. § 636(c), Fed. R. Civ. P. 73, and D.C.COLO.LCivR 72.2. [#22].

On October 30, 2014, Judge Boland held a Scheduling Conference at which he ordered the Parties to complete discovery by May 19, 2015, file dispositive motions on or before June 23, 2015, and appear for a Final Pretrial Conference on August 27, 2015. [#23, #24]. The matter was reassigned to the undersigned Magistrate Judge on February 10, 2015. [#78].

On June 23, 2015, Defendant filed the instant Motion for Summary Judgment, consisting of 55 pages to which 22 exhibits are attached, for a total of 227 pages. [#32]. In a Minute Order dated June 30, 2015, this court ordered that a reply would not be permitted, on the basis that this civil action was initiated by a litigant proceeding *pro se;* the Complaint totals seven pages and consists of no more than ten paragraphs of factual allegations, and Defendant's Motion was excessive in its length. [#36]. Plaintiff failed to file a Response to the Motion despite a Minute Order specifying the deadline. [#35]. The docket does not indicate that the Minute Order was returned in the mail as undeliverable.

The Parties submitted separate Proposed Pretrial Orders, and the undersigned presided over a Final Pretrial Conference on August 27, 2015. [#40, #41, #42]. Due to the Parties' separate submissions, the court ordered the Parties to meet and confer and submit an additional proposed Final Pretrial Order, and indicated that to the extent that disputes still existed, it would set an additional Final Pretrial Conference. [#42].

## STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem*

---

that document, or where applicable, the page and line number of a transcript.

*Coal Co., Inc.,* 41 F.3d 567, 569 (10th Cir. 1994).  "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986)).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service,* 812 F.2d 621, 623 (10th Cir. 1987).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson,* 477 U.S. at 248.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002).  However, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case.  *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir. 1994) (citation omitted).  When, as here, the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying "a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 671 (10th Cir. 1998) (citation omitted).  *See also Anderson*, 477 U.S. at 256 (The nonmovant "may not rest upon mere allegation or denials of his

pleadings, but must set forth specific facts showing that there is a genuine issue for trial.").

Conclusory statements based merely on speculation, conjecture, or subjective belief are not

competent summary judgment evidence. *See Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875

(10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [her]

case or a denial of an opponent's allegation" or it will be disregarded. *See* 10B Charles Alan

Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998).

"A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent

standard than formal pleadings drafted by lawyers." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th

Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972)). "The *Haines* rule applies to

all proceedings involving a *pro se* litigant, including … summary judgment proceedings." *Id.* at

n. 3 (citations omitted). However, the court cannot be a *pro se* litigant's advocate. *Yang v.

Archuleta*, 525 F.3d 925, 927 n. 1 (10th Cir. 2008). "Although [o]ur summary judgment

standard requires us to view the facts in the light most favorable to the non-moving party[,] it

does not require us to make unreasonable inferences in favor of the non-moving party." *Carney

v. City & Cnty. of Denver*, 534 F.3d 1269, 1276 (10th Cir. 2008) (quoting *Starr v. Downs,* 117

Fed. App'x. 64, 69 (10th Cir. 2004)). Because Ms. Anderson failed to file a Response to the

Motion for Summary Judgment, the court deems the properly supported facts offered by the

Bank as true. *See* Fed. R. Civ. P. 56(e)(2); *Lammle v. Ball Aerospace & Techs. Corp.*, Case No.

11-cv-3248-MSK-MJW, 2013 WL 4718928, *1 (D. Colo. Sept. 1, 2013). In doing so, however,

the court has reviewed the entirety of the exhibits submitted by Defendant to ascertain the

context of such statements. Despite Ms. Anderson's lack of response, the court may not enter

summary judgment unless the Bank carries its burden under Rule 56 of the Federal Rules of

Civil Procedure. *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

## FACTUAL ALLEGATIONS

The court has reviewed the facts as submitted and, without a Response, construed to the best of its ability any disputed fact favorably to the nonmovant. The material facts are as follows.[2]

<u>Individuals Involved</u>

Ms. Anderson is an individual who was 53 years of age when the events underlying the Complaint occurred. [#1 at 6]. The Bank is local to Colorado and operates twenty-six retail banking locations in the state; between 2009 and 2012, the Bank operated a retail banking location at 1050 South Hover Road, Longmont, Colorado ("Twin Peaks Branch") and 3561 Stagecoach Road, Longmont, Colorado ("Del Camino Branch"). [#32-2 at ¶¶ 4-5]. Laura Baggus is the Bank's current Vice President of Human Resources, and has held that position since January 2011. [#32-2 at ¶ 1]. She was previously Assistant Vice President of Human Resources, and has been employed by the Bank since August 31, 2006. *Id.* Dolores DiPetrillo ("Ms. DiPetrillo") was the Bank's Branch Manager for the Twin Peaks and Del Camino branches as well as a third branch. [#32-2 at ¶ 8]. Ms. DiPetrillo was physically present in each branch she managed "one to two times per week or about six to eight times per month." [#32-2 at ¶ 9]. Ms. DiPetrillo was born in 1968, and was thus approximately 42 and 43 years of age when the events underlying the Complaint occurred. [#32-2 at ¶ 10]. Stephanie Hardy ("Ms. Hardy") was the Bank's Branch Service Manager for the Twin Peaks and Del Camino branches as well as a third branch. [#32-14 at ¶¶ 1-2]. Ms. Hardy was physically present in each branch she managed "one or two time per week or about six to eight times per month." [#32-14 at ¶ 3]. Michael DiPetro ("Mr. DiPetro") was the Bank's Executive Vice President for Retail Banking,

---

[2] Unless otherwise noted, the following facts relate to the time period relevant to the Complaint.

responsible for all of the Bank's branches in Colorado and would often approve courses of action related to the discipline or termination of employees.  [#32-15 at ¶¶ 1-2].  Mr. DiPetro was born in 1964, and was thus approximately 46 and 47 years of age when the events underlying the Complaint occurred.  [#32-15 at ¶ 3].  Kim Whaley ("Ms. Whaley") was the Bank's Senior Vice President for Branch Administration, responsible for implementing policies and procedures, ensuring policies were followed correctly, reviewing branch auditor reports to ensure compliance with policies and procedures, managing risk, and working closely with Human Resources on branch-related Human Resources issues.  [#32-16 at ¶¶ 1-2].  Ms. Whaley was born in 1954, and was thus approximately 56 and 57 years of age when the events underlying the Complaint occurred.  [#32-16 at ¶ 3].  Rebecca Adauto ("Ms. Adauto") was the Bank's Senior Vice President for Human Resources, responsible for addressing issues related to corrective actions and employee termination.  [#32-18 at ¶ 2].  Employees at each branch of the Bank "fill[ed] various positions, including Teller, Financial Services Representative, and Operations Specialist."  [#32-2 at ¶ 6].

<u>The Bank's Policies, Procedures, and Training</u>

The Bank has in place an EEO Statement prohibiting discrimination on the basis of age and disability, among other protected categories.  [#32-2 at 14; #32-3 at 3].  The Bank also had in place a policy regarding accommodations of employees under the ADA.  [#32-3 at 4].  The EEO Statement and ADA policy are included in the Employee Handbook that the Bank disseminated to its employees, including Ms. Anderson.  [*Id.*]  The Employee Handbook states that employment with the Bank is "at will," and that both the Bank and the employee have the right to terminate the employment relationship "with or without advance notice for any reason." [#32-3 at 2].  The Employment Handbook specifies than an employee's unsatisfactory

performance or unacceptable conduct will be met with discipline ranging from "informal discussion to immediate termination, depending on the Company's opinion of the seriousness of the situation."  [#32-4 at 5].  The Employee Handbook contains a section titled "Open Door Guidelines,"  which encourages employees to discuss work-related problems with their manager, a Human Resources representative, or upper   management.   [#32-4 at 9].   The Employee Handbook also includes a description of its reporting system called EthicsPoint, "which is an anonymous and confidential reporting tool to communicate misconduct and promote a positive work environment."  [*Id.* at 6-7].  Throughout her employment with the Bank, Ms. Anderson acknowledged that she had received and read the Employee Handbook, understood her employment with the Bank to be at will, and understood the Bank's policies regarding discrimination and reporting problems.  [#32-2 at ¶ 15; #32-5; #32-19 at 25:12-26:6, 32:14-34:2, 35:5-13].

The Bank additionally maintained policies and procedures on its internal Intranet, which employees could access at any time.  [#32-19 at 39:1-10].  One of these policies was for, under which cash kept in a branch, typically in the vault, could be accessed only by two individuals each of whom had half the combination needed to open the vault ("offsets").  [*Id.* at 39:11-25].  These individuals were required to remain in the vault together at all times while the vault was open.  *Id.*  Plaintiff knew of and had understood the Dual Control policy since the beginning of her employment with the Bank, and acknowledged reading and understanding the policy as early as 2005.  [*Id.* at 40:1-25; #32-2 at ¶ 16; #32-6].  In signing the policy, Plaintiff acknowledged that she must "inform the Security Department immediately" if she suspected her keys or combinations had been compromised, and that "failure to maintain adequate dual control, by not securing and safeguarding [ ] keys and combinations, will be cause for termination."  [#32-6].

The Dual Control policy is encompassed in the Bank's Cash Control policy, which requires the vault to be locked at all times, except to remove or add excess currency.  [#32-2 at ¶ 17; #32-19 at 46:18-47:1].  Ms. Anderson also understood and periodically reviewed the Bank's Keys and Combinations policy, which required in part that employees "report any breach of confidentiality involving combinations to a supervisor immediately," and instructed that "the company has zero tolerance for any wrongful actions, [and that employees should] report any unusual circumstances immediately."  [#32-19 at 41:17-42:9; #32-2 at ¶ 18; #34-1].  Finally, the Bank Secrecy Act requires all banks to maintain a Customer Identification Program ("CIP").  The Bank's CIP policy required employees to obtain four specific pieces of verifiable identification from each Bank customer, without exception.  [#32-2 at ¶ 19; #41-2, #41-3; #32-19 at 43:2-44:7-20].  Plaintiff attended annual Loss Prevention Trainings, where employees reviewed the Bank's cash control policies as well as the CIP policy.  [#32-19 at 47:14-48:1].

<u>Ms. Anderson's Employment with the Bank April 2003 through November 2010</u>

Ms. Anderson began working for the Bank in April 2003 as a Financial Services Representative.  [#32-19 at 20:5-6].  In 2008, Plaintiff began reporting to Ms. DiPetrillo.  [*Id.* at 51:8-14; #32-2 at ¶ 8].  The following year, Plaintiff also began reporting to Ms. Hardy, whom the Bank had hired as Branch Service Manager for the Del Camino branch.  [#32-19 at 51:15-21; #32-14 at ¶ 2].

In March 2009, Ms. Anderson was diagnosed with breast cancer, for which she underwent a lumpectomy in July 2009, chemotherapy treatments from September to November 2009, and radiation treatments from December 2009 until March or April 2010.  [#23-19 at 49:10-13, 52:19-21, 54:14-19, 56:25-58:3; 58:19-59:5].  In December 2009, Plaintiff underwent surgery for a blood clot in her right leg.  [*Id.* at 95:1-8].  On November 24, 2009, to

accommodate and focus on her health, Plaintiff took medical leave from work through the Family and Medical Leave Act ("FMLA").  [*Id.* at 59:23-60-8; #43 at 13].  She exhausted her FMLA leave in February 2010; however, she was still receiving radiation treatments and utilizing a wheelchair, and her physician had not released her to return to work.  [#23-19 at 60:9-15; 61:5-20].  Plaintiff testified that she had nonetheless offered to Ms. DiPetrillo that she would return in a wheelchair, and Ms. DiPetrillo had told her "not to worry about it…just [ ] get better." [*Id.* at 60:12-15].  Plaintiff was let go a few weeks after that phone call on the basis that she had exhausted her FMLA leave and had not been released to return to work.  [#32-2 at ¶¶ 22-23].  At that time, Ms. Baggus informed Plaintiff that the Bank would re-hire her for a comparable position as soon as she furnished a release from her physician.  [*Id.* at ¶ 24].

Ms. Anderson supplied a release to Ms. Baggus effective April 12, 2010, after which the Bank hired Plaintiff as a Senior Teller at the Twin Peaks branch at her same pay rate, with the benefits and credit for years of service which she had earned prior to taking FMLA leave.  [#32-2 at ¶ 27; #32-19 at 60:21-24, 62:3-13, 63:9-12; #32-20 at 77:2-7; #32-8].  The medical release contained the following temporary work restrictions: "Seated with leg in elevated position. Start with 6 hrs/day, 5 days/week. Review after 2 weeks."  [#32-20 at 66:1-67:11; 67:14-19; #32-2 at ¶¶ 25-26; #32-8].  Ms. Baggus attested that the Bank did not consider the restrictions permanent because the release provided for a review of Plaintiff's restrictions after two weeks.  [#32-2 at ¶ 29].  When Plaintiff returned to the Bank, she worked a part-time schedule of 30 hours per week [#32-2 at ¶ 28; #32-19 at 65:24; #32-20 at 73:8-17]; she was situated in the drive-through station of the Twin Peaks branch and allowed to perform her teller duties from a high chair so as to elevate her leg.  [#32-2 at ¶ 28; #32-14 at ¶ 5; #32-20 at 69:24-70:3, 70:19-71:5].  Plaintiff testified that at this station, she was required to stack kitchen chairs and bring her own pillows in

order to elevate her leg.  [#32-20 at 70:15-18].  After her first week, Ms. Anderson represented to Ms. DiPetrillo and Ms. Hardy that she was "getting through the day" in her part-time position, but expressed hesitation about returning to a full-time schedule and asked that she be moved to a sit-down teller station in the lobby of the branch.  [#32-2 at ¶¶ 20, 30; #32-7; #32-14 at ¶¶ 6, 7].  Ms. DiPetrillo responded that the Bank could extend Plaintiff's part-time schedule for an additional two weeks.  [#32-2 at ¶¶ 20, 30; #32-7; #32-14 at ¶ 6; #32-20 at 75:16-20].  Ms. Baggus and Ms. Hardy attested that during Plaintiff's part-time schedule, she never notified a member of management or Human Resources that her sit-down station in the drive-through was not adequately accommodating her work restrictions.  [#32-2 at ¶ 33; #32-14 at ¶ 9].

On May 4, 2010, Ms. Anderson was cleared to return to work full-time, though the release stated she would need to "continue with the restriction of remaining seated with foot elevated at least 75% of the time," and should be re-evaluated in one month.  [#32-2 at ¶¶ 35-36; #32-9; #32-20 at 80:24-81:16].  Plaintiff resumed a full-time schedule with the Bank on May 10, 2010.  [#32-20 at 84:15-17].  She remained stationed in the drive-through, where, Ms. Baggus and Ms. Hardy attested, she could sit while performing her teller duties and elevate her leg 75 percent of the time.  [#32-2 at ¶ 37; #32-14 at ¶¶ 10, 12].  Ms. Anderson did not return for evaluation after one month, did not provide the Bank with new restrictions, and never again raised the issue of an accommodation for her leg.  [# 32-20 at 81:21-82:1; 83:17-84:2, 84:18-85:9; #32-2 at ¶ 38; #32-14 at ¶ 13].  She also did not contact EthicsPoint with a concern about her work restrictions.  [#32-20 at 86:1-10].

<u>Ms. Anderson's Employment with the Bank December 2010 through May 2011</u>

In December 2010, Plaintiff was promoted from Senior Teller to Branch Operations Specialist.  She was transferred to the Del Camino branch where she was responsible for the day-

to day operations, including supervising tellers and financial services representatives, preparing reports, and conducting audits for the branch.  [#32-20 at 86:15-19, 86:20-25; 87:19-25, 88:10-18, 91:21-24].  Plaintiff's official duties included the following: ensure "that all activities and work functions comply with compliance requirements as defined in company policies and procedures and state/federal laws and regulations"; perform "branch operational duties including: ensuring smooth daily workflow, reviewing various reports, guiding the operations team ensuring the duties of each position are performed according to established guidelines"; comply "with bank operations and security procedures by accurately adhering to and supporting all dual-control functions, auditing and other forms of certification."  [#32-10; #32-2 at ¶ 39; #32-20 at 88:23-89:24, 89:25-90:5, 90:9-24].  One of Plaintiff's primary job duties was to complete a Monthly Certification Packet ("MCP"), which certifies certain activities and tasks, such as how many new accounts have been opened and the number of internal audits performed.  [#32-20 at 118:10-119:5].

In her new position, Ms. Anderson continued to report to Ms. DiPetrillo and Ms. Hardy.  [#32-20 at 91:13-20].  Ms. Hardy attested that Plaintiff struggled in the Operations Specialist role; she had difficulty learning new tasks, frequently submitted late reports, and had to be counseled regarding various issues.  [#32-14 at ¶ 18].   In May 2011, Ms. Hardy counseled Plaintiff about an incident with a cash ticket.  [#32-14 at ¶ 19; #32-2 at ¶ 20; #32-7 at 4].  The following month, Plaintiff confused her deposit limit as $100,000 when it was $500,000.  [#32-14 at ¶ 20; #32-2 at ¶ 20; #32-7 at 5].  Ms. Hardy attested that Plaintiff struggled to complete the MCP accurately and on time, despite months of training, causing her and Ms. DiPetrillo to spend significant time correcting mistakes prior to finalizing the reports.  [#32-14 at ¶¶ 22-24; #32-20 and #32-21 at 129:25-130:22].

<u>Ms. Anderson's Employment with the Bank Post May 2011</u>

In June 2011, Plaintiff experienced a blocked artery in her right leg, for which she underwent a bypass and took approximately six weeks of medical leave.  [#32-20 at 95:10-24, 96:3-10; #32-2 at ¶ 41].  Ms. Anderson returned to work in late July 2011 with a medical release for full duty as tolerated, stating that Plaintiff "may need to elevate leg if swelling."  [#32-20 at 96:16-19, 97:10-20; #32-2 at ¶ 42; #32-13].  Plaintiff furnished the release to Ms. DiPetrillo but did not ask for an accommodation for her leg.  [#32-21 at 174:14-21; #32-14 at ¶ 16].  Plaintiff experienced swelling in her leg and elevated it when she could, but she made an effort to stand when she spoke with customers based on her own preferences.  [#32-20 at 97:21-98:4, 99:17-100:1, 100:9-17].

Between August and December 2011 Ms. Anderson's condition improved; she walked twenty minutes on a treadmill, stood for prolonged periods at work, and took a vacation to the Galapagos Islands where she participated in a few short hikes.  [#32-20 at 100:18-25,  105:24-107:17;  109:13-111:7;  111:14-112:7,  112:11-113:2;  #34-4 at 11, 13, 15].   By March 2012, Plaintiff was "participating fully" in her work activities, including standing for long periods of time, and walking for exercise most days.  [#32-20 at 113:15-115:6, 116:7-117:23; #32-21; #34-4 at 5, 8].

<u>Events Leading Up to Ms. Anderson's Termination</u>

Following her return to the Bank in late July 2011, Plaintiff continued to struggle with her responsibilities as Operations Specialist, as documented in her annual employee performance review issued on February 6, 2012.  [#32-2 at ¶ 40; #32-11 at 2, 3, 6; #32-14 at ¶ 25; #32-20 at 129:8-13; #32-21 at 130:23-131:4].   In particular, Plaintiff's managers wrote that "Marie has struggled with the required responsibilities of the Operations Specialist position.  She can

improve in this area by thoroughly completing the MCP without assistance and thoroughly gathering information required for the packet." [#32-11 at 2]. They further commented that "Marie is aware that improvement is needed in this area. It is recommended…that Marie creates a consistent routine to follow to assist in completing required, time sensitive branch tasks. She'll need to turn in her MCP's in a timely manner as well as set a positive and productive example for the branch staff." [#32-11 at 2-3; #32-21 at 131:14-23]. Plaintiff was indeed aware that improvement was needed in that area. [#32-21 at 131:5-13; 131:24-132:2].

Ms. Hardy attested that Plaintiff also struggled with understanding and following Bank policies throughout 2011 and 2012. [#32-14 at ¶ 26]. In September 2011, Plaintiff violated Bank policy by not confirming customers' birthdates on their signature cards. [#32-2 at ¶ 20; #32-7 at 8]. In February 2012, Plaintiff violated Bank policy in opening a new account without obtaining verification of the customer's social security number then failing to concurrently run a verification report. The verification report completed the following week called the customer's identity into question. [#32-2 at ¶ 20; #32-7 at 10-12; #32-14 at ¶ 27]. In March 2012, Mary Tigges, Vice President and Bank Secrecy Act Officer for Guaranty Bank, expressed concern that the Del Camino branch, under Plaintiff's supervision, had violated internal procedure by failing to complete Currency Transaction Reports ("CTRs") the same day as each transaction was conducted. [#32-7 at 13-14; #32-14 at ¶ 28]. Later that month, Plaintiff neglected to activate the alarm at her desk and missed participating in a test of all alarms conducted by the Bank; mismarked, along with another employee, a Loomis cash bag for $5,000 less than what it contained; and failed to adequately prepare the Bank for a Saturday shift, which caused only one teller to have a cash drawer for the Saturday drive-up hours. [#32-2 at ¶ 20; #32-7 at 15-17; #32-14 at ¶¶ 29-31; #32-21 at 139:12-140:5].

On April 4, 2012, Ms. DiPetrillo and Ms. Hardy met with Ms. Anderson to discuss various concerns, including the Loomis incident, the failure to properly prepare for the Saturday shift, the fact that the branch's open/close log and temporary key logs for the month of March were missing initials and were not corrected within a timely manner, and that "on several occasions, the branch had been left scrambling to balance the vault at the last minute and due to lack of planning, did not have the correct dual offsets to gain entrance to the vault." [#32-14 at ¶32]. They requested that Plaintiff be more careful and aware. [*Id.* at ¶ 33]. Later that month, Plaintiff failed to properly execute a "surprise cash audit," which is where an Operations Specialist completes an unannounced count of a teller's cash drawer. Assistant Vice President for Branch Administration Lee Ann Hudson observed Plaintiff inform a teller of the audit and permit the teller to enter the vault alone prior to the count. [#32-2 at ¶ 20; #32-7 at 18; #32-14 at ¶ 34]. Ms. Hudson reported this incident to Ms. Whaley, who then informed Ms. DiPetrillo and Ms. Hardy and noted that "Marie should really know better after all the training we have provided." [#32-2 at ¶ 20; #32-16 at ¶¶ 8-9; #32-14 at ¶ 34; #32-7 at 18]. Ms. DiPetrillo addressed the mistake with Plaintiff, who acknowledged her error. [#32-2 at ¶ 20; #32-7 at 18].

A June 18, 2012, email correspondence with Plaintiff regarding the process of opening a checking account for a new customer caused Ms. Whaley serious concern that Plaintiff did not understand the CIP policy and that familiarity with a client cannot replace CIP verification. [#32-16 at ¶ 10; #32-14 at ¶ 35; #32-2 at ¶ 20; #32-7 at 21-24]. Ms. Whaley subsequently communicated her concerns to Ms. DiPetrillo and Ms. Hardy. *Id.* Later that month, after receiving a call from Karen Scott, Vice President, Deposit Operations Manager, Ms. Whaley again expressed concern to Plaintiff's managers regarding Plaintiff's performance and understanding of Bank policies, and asked if they had other concerns. [#32-16 at ¶¶ 11-12; #32-

14 at ¶ 35; #32-2 at ¶ 20; #32-7 at 19].   Ms. DiPetrillo responded that Ms. Hardy continued to assist Plaintiff in completing sections of the MCP, that Plaintiff continued to struggle as a leader in the branch, and that she and Ms. Hardy were concerned with Plaintiff's performance.  [#32-16 at ¶ 13; #32-2 at ¶ 20; #32-7 at 19].  By July 2012, Ms. Hardy had been alerted to customer complaints that Plaintiff was abrasive, and employee complaints that Plaintiff was negative, unprofessional, and created unnecessary strife in the workplace.  [#32-14 at ¶ 36].

Performance concerns and customer and employee complaints culminated in the Bank issuing a "Corrective Action" to Ms. Anderson on July 31, 2012.  [#32-14 at ¶ 37; #32-2 at ¶ 40; #32-12].  The Corrective Action took issue with the following: late submissions of MCP packets; failure to timely complete surprise cash audits for the month; lack of organization, including misplacing the signature card for the branch's safe deposit box; lack of job knowledge; missed meetings; and a negative and abrasive demeanor toward customers and other employees.  [#32-12; #32-14 at ¶ 38; 32-2 at ¶ 40].  The Corrective Action required Ms. Anderson to accurately and timely complete the MCP process, and to read the Key and Combination, CIP, and Stop Payment policies and discuss those with her managers.  [#32-14 at ¶ 42; #32-2 at ¶ 40; #32-12; #32-21 at 148:11-17].  The Bank expressed to Plaintiff the expectation that she "demonstrate a thorough understanding of bank policies and procedures, make sound business decisions, and minimize unnecessary risk to the Bank," and that "failure to show immediate and sustained performance improvement or the occurrence of any other incidents of misconduct could result in further corrective action or termination of [Plaintiff's] employment."  [#32-14 at ¶¶ 42-43; #32-2 at ¶40; #32-12; #32-21 at 146:21-147:12, 148:11-24].

On August 1, 2012, shortly after receiving the Corrective Action, Ms. Anderson informed Ms. Hardy that she did not understand how to compile teller aggregate totals for the Branch, a

task which Ms. Hardy believed Plaintiff should have been comfortable performing after almost two years in the Operations Specialist position. [#32-14 at ¶ 44; #32-2 at ¶ 20; #32-7 at 26]. On October 1, 2012, Plaintiff violated CIP policy by failing to review the information for a new account within twenty-four hours opening the account, resulting in a "huge CIP exception." [#32-14 at ¶ 45; #32-2 at ¶ 20; #32-7 at 27].

Ms. Anderson's Termination

On October 4, 2012, Ms. DiPetrillo and Ms. Hardy were present in the Del Camino branch and discovered that the door to the cash vault was unlocked. [#32-14 at ¶ 46; #32-21 at 149:1-6, 150:2-7]. When they informed Ms. Anderson of this, Plaintiff responded with disbelief that the employees would leave the vault door unlocked, again, and on a day when the managers were in the branch. [#32-14 at ¶ 47; #32-21 at 150:6-11, 152:2-5]. Plaintiff explained that "they" thought leaving the vault unlocked was acceptable because the employee with the offset to the vault had taken lunch during the time when Loomis was scheduled to arrive. [#32-14 at ¶ 48]. Ms. Anderson acknowledged that employees at her branch had previously left the vault unlocked, and she had not reported that transgression to management. [#32-14 at ¶ 49; #32-21 at 152:8-24, 159:8-23]. Plaintiff testified that she knew her employees had left the vault unlocked the previous month, but that she "thought [she] had taken care of that situation. And [she] was not aware that they were continuing to leave that vault open." [#32-21 at 149:1-150:11]. She further testified that she did not report the incident to her managers because she believed she had discretion in handling the situation. [#32-21 at 152:8-14].

Ms. Whaley attested that the failure to lock the vault constituted a "serious violation of numerous [Bank] policies, including the Cash Control policy and the Keys and Combinations Policy." [#32-16 at ¶ 15]. Following a report from Plaintiff's managers, Ms. Whaley conducted

17

an investigation into the incident, which included interviewing several of the branch's employees. [#32-14 at ¶ 51; #32-16 at ¶¶ 14, 16-17; #32-22 at 178:4-6].  She learned from these employees that they regularly left the vault unlocked on Thursday afternoons, the day of the Loomis delivery, to accommodate the lunch break of whichever employee held an offset.  [#32-16 at ¶¶ 17-22; #32-17].  The employees reported that this routine had been implemented with Plaintiff's full knowledge and agreement.  *Id.*  Ms. Whaley surmised from these interviews that Plaintiff's "inconsistent enforcement of Bank policies contributed to an atmosphere of confusion as to which policies were to be followed, and which were not," [#32-16 at ¶ 23], and concluded that Ms. Anderson knew of and condoned the employees' practice of leaving the vault unlocked. [#32-16 at ¶ 25; #32-21 at 177:9-13].   Ms. Whaley thereafter met with Mr. DiPetro and Ms. Aduato and decided, along with Ms. DiPetrillo and Ms. Hardy to terminate Plaintiff's employment with the Bank.  [#32-16 at ¶¶ 27-28; #32-15 at ¶¶ 7-8; #32-18 at ¶¶ 6-7; #32-14 at ¶¶52, 54].

Ms. Anderson filed a charge of discrimination based on age and disability with the Colorado Civil Rights Division and the Equal Employment Opportunity ("EEO") Commission on April 22, 2013 [#1 at 6-7], and received her Right to Sue letter on March 3, 2014 [#1 at 4].

## ANALYSIS

### I.   Claim of Unlawful Discharge

Courts within the Tenth Circuit generally consider disparate-treatment claims, such as those for age and disability discrimination, within the framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05 (1972).  *Hawkins v. Schwan's Home Service, Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (citing *Davidson v. Am. Online, Inc.,* 337 F.3d 1179, 1189 (10th Cir. 2003). The *McDonnell Douglas* burden-shifting analysis "may be unnecessary and inappropriate,"

however, where there is direct evidence of discrimination or where the employer acknowledges that the plaintiff's disability played a prominent role in the employment decision. *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 n.3 (10th Cir. 1997). "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons." *Riggs v. AirTran Airways, Inc.,* 497 F.3d 1108, 1117 (10th Cir. 2007) (brackets omitted) (internal quotation marks omitted). This evidence must "speak directly to the issue of discriminatory intent" as well as "relate to the specific employment decision in question." *Chytka v. Wrigth Tree Service, Inc.*, 925 F. Supp. 2d 1147, 1162 (D. Colo. 2013) (citation omitted). Ms. Anderson testified that Ms. DiPetrillo referred to the Twin Peaks branch as her "old lady branch" on three or four different occasions because "mostly elderly ladies" worked there. [#32-21 at 134:23-135:22, 144:15-24]. Comments in the workplace that reflect personal bias may qualify as direct discrimination if the speaker had decision making authority and acted on his or her discriminatory beliefs. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *Ramsey v. City & Cnty. of Denver,* 907 F.2d 1004, 1007–08 (10th Cir. 1990)). Ms. DiPetrillo participated in the decision to fire Plaintiff, but there is no evidence in the record before me that she based her decision in whole or in part on Plaintiff's age. Indeed, during her deposition, Ms. Anderson could not recall ever hearing Ms. DiPetrillo comment negatively about an employee's age, and testified that Ms. DiPetrillo never made a negative comment about Plaintiff's age. [#32-21 at 192:1-6]. There is no evidence that Ms. DiPetrillo acted on any personal bias towards Plaintiff. Accordingly, Ms. Anderson has not established an incidence of direct discrimination and this court will analyze her unlawful termination claim pursuant to the *McDonnell Douglas* test.

Under the *McDonnell Douglas* test, "the critical *prima facie* inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under

circumstances which give rise to an inference of unlawful discrimination." *Plotke v. White,* 405 F.3d 1092, 1100 (10th Cir. 2005) (citation and quotations omitted).  The components of a *prima facie* case may vary depending on the nature of the claim.  *Id.  See also Barlow v. C.R. England, Inc.,* 703 F.3d 497, 505 (10th Cir. 2012).  As is appropriate here, Plaintiff must demonstrate that (1) she belongs to a protected class; (2) she was qualified and satisfactorily performing her job; and (3) she was terminated under circumstances giving rise to an inference of discrimination. *See Barlow*, 703 F.3d at 505.  "Plaintiffs can establish evidence of the third prong in various ways, such as 'actions or remarks made by decision makers, preferential treatment given to employees outside the protected class,' or 'more generally, upon the timing or sequence of events leading to plaintiff's termination.'"  *Id.* (quoting *Plotke,* 405 F.3d at 1101 (citation and quotation omitted)).

The *prima facie* burden is "slight," *Orr v. City of Albuquerque,* 417 F.3d 1144, 1149 (10th Cir. 2005), and, if demonstrated, requires the Bank to articulate a nondiscriminatory reason for the adverse employment action.  *See Barlow*, 703 F.3d at 505.  Plaintiff may then present evidence to show that the Bank's rationale is pretextual.  *See Fye v. Oklahoma Corp. Comm'n,* 516 F.3d 1217, 1227 (10th Cir. 2008).  In order to establish a genuine issue of material fact as to pretext, a plaintiff must produce evidence that a defendant's non-discriminatory reason is "unworthy of belief."  *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995).  "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Morgan*, 108 F.3d at 1323).

A.    Age Discrimination under the ADEA

Plaintiff claims the Bank terminated her because of her age; the Bank argues it terminated

Plaintiff as a result of her unsatisfactory work.  It is unlawful for any employer to refuse to hire, fire, or otherwise discriminate against an individual with respect to the compensation, terms, conditions, or privileges of her employment because of such individual's age.  29 U.S.C. § 623(a)(1).  "To establish a disparate-treatment claim under the plain language of the ADEA, therefore, a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 653 (2008)) (further citation omitted).  In this Circuit, while Plaintiff need not allege that her age was the *sole* motivating factor for her termination, she must allege that "age was the factor that made a difference" in causing the adverse action.  *Jones v. Oklahoma City Public Schools*, 617 F.3d 1273, 1277-78 (10th Cir. 2010) ("an employer may be held liable under the ADEA if other factors contributed to its taking an adverse action, as long as age was the factor that made a difference").[3]

The Bank has put forth a long, detailed, and well-documented history of Plaintiff's performance issues spanning almost two years.  The record demonstrates that Ms. Anderson struggled continuously with several specific responsibilities of the Operations Specialist position, in particular completing the MCP accurately and on time, *see, e.g.,* [#32-20 and #32-21 at 129:25-130:5, 130:9-22, 126:15-127:13, 147:23-148:1] and complying with CIP protocol, *see e.g.,* [#32-7 at 8, 10-11; #32-14 at ¶ 27].  She was instructed as early as February 2012 on the importance of serving as a leader, being positive, and setting a productive example for her staff [#32-11 at 2-3], and yet was the subject of both customer and employee complaints in July 2012.

---

[3] Notwithstanding Justice Thomas's comment in *Gross* that "the Court has not definitively decided whether the evidentiary framework of [*McDonnell Douglas*] utilized in Title VII cases is appropriate in the ADEA context (*Gross*, 557 U.S. at 175 n. 2), the Tenth Circuit has reaffirmed its application of *McDonnell Douglas* to discrimination cases under the ADEA.  *See Jones*, 617 F.3d at 1278.

[*See* #32-14 at ¶ 36].  Finally, she was found to have committed a "serious violation" of the Bank's Cash Control policy and the Keys and Combinations Policy when the vault at her branch was discovered unlocked.  [#32-16 at ¶ 15].  This infraction was committed after the Bank warned her that "any other incidents of misconduct could result in further corrective action or termination of her employment."  [#32-12].  Ms. Whaley attested that Ms. Anderson's "poor judgment and lack of compliance with policy posed too great a risk for the Bank to continue her employment."  [#32-16 at ¶ 28].  A court "will not second guess business decisions made by employers, in the absence of some evidence of impermissible motives." *Lucas v. Dover Corp., Norris Div.,* 857 F.2d 1397, 1404 (10th Cir. 1988) (citation omitted).  Plaintiff has not met her burden of showing she was qualified for and satisfactorily performing her job.  *See Kirkland v. Safeway Inc.*, 153 F.3d 727, at *3 (10th Cir. July 10, 1998) (relying on record to show that at time of plaintiff's termination his performance did not meet his employer's legitimate expectations based on criteria in place at the time of termination).[4]

Ms. Anderson testified to several older women leaving the Bank as proof of the Bank's age discrimination, and stated that these women were "replaced by 20-year-olds."  [#32-21 at 190:3-7].  However, she acknowledged that these women either resigned or retired, and none were terminated.  [#32-21 at 190:10-191:23].  Furthermore, Ms. DiPetrillo was older than 40

---

[4] This court is aware it must guard against "[s]hort-circuiting" the *prima facie* analysis to allow a plaintiff the opportunity to demonstrate pretext.  *See Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1469-70 (10th Cir. 1992).  However, I find this situation to be different from those examined in *Kenworthy* and its progeny, and that no similar risk is present here.  Plaintiff chose not to file a Response and has thus not provided "credible evidence that…her work was satisfactory."  *Id.* at 1470.  Left to consider only the portions of Plaintiff's testimony and written discovery as supplied by Defendant, including Plaintiff's admissions in her testimony that she violated certain objective procedures and policies, I do not find that Plaintiff carries her *prima facie* burden to shift the burden to the Bank.  *Cf. Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1511 (10th Cir. 1997) (declining to consider defendants' subjective criteria used in assessing plaintiff's work

years of age at the time the Bank terminated Plaintiff, and three of the five individuals who participated in the decision to terminate Plaintiff were over 40 years of age at that time.  [#32-2 at ¶10, #32-15 at ¶ 3; #32-16 at ¶ 3].   Although members of a protected class may at times discriminate against other members of that same class, *Oncale v. Sundower Offshore Services, Inc.,* 523 U.S. 75, 78 (1998), courts within and outside this Circuit have recognized that the inference of discrimination is weakened when the decision maker is within the protected class. *See, e.g., Kitchen v. Burlington Northern and Santa Fe R. Co.*, 298 F. Supp. 2d 1193, 1203 (D. Kan. 2004); *Chan v. Donahoe*, 63 F. Supp. 3d 271, 294 (E.D.N.Y. 2014); *Demesme v. Montgomery Cnty. Gov't,* 63 F. Supp. 2d 678, 683 (D. Md. 1999) ("The fact that the decision makers were of the same protected class suggests no discriminatory motivation.")

Because Plaintiff has not established a *prima facie* case of discrimination on account of her age, I need not proceed to the additional steps of the *McDonnell Douglas* analysis.  However, even assuming that Plaintiff had established a *prima facie* case of age discrimination, the same facts offered by the Bank in arguing that Plaintiff failed to satisfy the *prima facie* showing that she was qualified for and satisfactorily performing her job also establish a legitimate, non-discriminatory reason for her termination that Ms. Anderson has not been rebutted as pretextual. *See Morgan*, 108 F.3d at 1323 (observing that once a defendant comes forward with a facially non-discriminatory reason for its action, the burden shifts to the plaintiff to establish a genuine issue of material fact that such proffered reason was pretextual, *i.e.* not worthy of belief).  Under any analysis, Plaintiff has failed to demonstrate that there is a genuine issue of material fact that requires this case to proceed to trial.

---

performance during *prima facie* inquiry). "If the plaintiff does not establish a prima facie case,

B.      Disability Discrimination under the ADA

The Complaint asserts a claim of discrimination on the basis of disability.  [#1 at 2].  The ADA prohibits discrimination against disabled individuals.  42 U.S.C. § 12112(a).  To state a prima facie case for discrimination under the ADA, Plaintiff must establish that (1) she is disabled; (2) she was qualified, with or without reasonable accommodation, to perform the essential function of her job; and (3) her employer discriminated against her because of her disability.  *Robert v. Bd. of County Comm'rs*, 691 F.3d 1211, 1216 (10th Cir. 2012).  Plaintiff bears the burden of raising a genuine issue of material fact on each element of her prima facie case. *Doyal v. Oklahoma Heart, Inc.,* 213 F.3d 492, 495 (10th Cir. 2000).

The Bank argues that Ms. Anderson was not disabled, and as stated above, was terminated because her work performance was not satisfactory.  The ADA Amendment Act of 2008 ("ADAAA"), went into effect on January 1, 2009 and broadened the definition of "disability."[5]  The broader construction does not alter the framework for the court's analysis in this case, however.  A person is "disabled" under the ADA if she has "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).  "To satisfy this definition, a plaintiff must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities."  *Carter v. Pathfinder Energy Servs., Inc.*, 662 F.3d 1134, 1142 (10th Cir. 2011) (internal quotation marks omitted).  Major life activities include caring for oneself, walking, seeing, hearing, speaking, working, sitting and standing.  42 U.S.C. § 12102(2).  An

---

her entire case fails." *Barlow*, 703 F.3d at 505.

[5] The ADAAA provides for a broader construction of the definition of disability.  *Crowell v. Denver Health and Hosp. Authority*, 572 Fed. Appx. 650, 658 (10th Cir. 2014) (citing 42 U.S.C. § 12102(4)(A) ("The definition of disability in this chapter shall be construed in favor of broad coverage ... to the maximum extent permitted by the terms of this chapter.").

individual's disabled status is determined at the time of the adverse action.  *Rebarcheck v. Farmers Coop. & Mercantile Ass'n*, 60 F. Supp. 2d 1145, 1151 (D. Kan. 1999) ("The relevant time for determining whether plaintiff was a qualified individual with a disability is at the time of discharge.").  Whether a plaintiff is impaired under the ADA and whether the identified activity is a major life activity are questions of law for the court.  *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).

As a preliminary matter, Plaintiff does not identify the major life activity that she contends was impaired.  *Morgan v. Goodwill Industries of Denver, Inc.*, No. 12–cv–00274–WYD–CBS, 2013 WL 6728777, at * 6 (D. Colo. Dec. 20, 2013) ("A plaintiff must identify the activity that [she] claims is impaired and establish that it constitutes a major life activity") (citing *Weixel v. Board of Educ. of City of New York,* 287 F.3d 138, 147 (2d Cir. 2002)).  Following a second medical leave of absence, Plaintiff returned to the Bank on July 25, 2011, capable of working full-time with the restriction that she "may need to elevate leg if swelling."  [#43 at 13; #32-20 at 96:16-22, 97:10-25; #32-13].  She also suffered from foot pain.  [#32-20 at 116:23-117:6].  To the extent she would argue she is substantially limited in the major life activity of working, she must show "significant[ ] restrict[ion] in the ability to perform either a *class of jobs* or a *broad range of jobs in various classes* as compared to the average person having comparable training, skills and abilities."  *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir. 1994) (citing 29 C.F.R. § 1630.2(j)(3)(i)), *aff'd,* 527 U.S. 471 (1999).  Plaintiff does not dispute that she did not request a medical accommodation from the Bank following her return in July 2011 [#43 at 13], and she was able to work her full-time job at the Bank prior to her termination.  [#32-21 at 197:14-16].  *See Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1257 (10th Cir. 2001) (affirming decision that plaintiff was not substantially limited in the major life activity of

working in part based on plaintiff's acknowledgment that she was able to perform all the duties required of her job while she was employed).   As to the substantial limitation of standing or walking, Plaintiff testified that while her leg swelled and she elevated it when she could, she chose to stand and shake hands when a customer approached her station.   [#32-20 at 99:17-19, 100:9-17].   By March 2012, Plaintiff's pain had subsided, she was fully participating at work though was tired in the evenings, she stood on her feet for long stretches of time, and walked for exercise on her treadmill most days.   [#32-20 at 113:16-115:6].   By May 2012 she fully participated at work and home and attempted to walk between 25 and 30 minutes each day for exercise.   [#32-20 at 116:11-117:12].   An employee is generally not considered disabled where the impairment was temporary or short-term.   *See Morgan v. Goodwill*, 2013 WL 6728777, at * 5 (collecting cases).

Even under the less demanding standard set forth in the ADAAA, Ms. Anderson cannot overcome summary judgment on this claim.   There is no indication in the record that Ms. Anderson was disabled under the statute at the time of her termination.   It is her "summary judgment responsibility to present evidence sufficient to meet her burden of production on the 'disability' element of her prima facie case," and she has not done so.   *Allen v. SouthCrest Hosp.*, 455 Fed. Appx. 827, 833 (10th Cir. 2011).   Even if I found that Plaintiff was disabled under the statute, there is no basis for finding that the Bank terminated her employment as the result of impairment.   Construing the evidence in the light most favorable to the non-moving party, I do not find that Plaintiff has established a *prima facie* case of disability discrimination. And even assuming that Plaintiff could establish a *prima facie* case of disability discrimination, the Bank's undisputed facts regarding her work performance are sufficient to demonstrate a legitimate, non-discriminatory reason for her termination, shifting the burden back to Ms. Anderson to

demonstrate that there is a genuine issue of material fact that the reason proffered by the Bank was pretextual.  Having failed to proffer any evidence that the Bank's concerns about her performance were simply pretext to hide disability discrimination, Ms. Anderson's claim cannot survive summary judgment.  *See Morgan*, 108 F.3d at 1323.

## II.    Claim for Failure to Accommodate

Ms. Anderson asserts the Bank denied her a reasonable accommodation on the following occasions: (1) Ms. DiPetrillo allegedly discouraged Plaintiff from attending a medical appointment in August 2009, though Plaintiff ultimately kept the appointment [#32-21 at 163:19-164:13, 170:22-171:3; #32-22 at 4-5]; (2) in early 2010, the Bank did not permit her to return to work prior to date designated in her medical release [#32-21 at 171:4-172:4; #32-22 at 4-5]; (3) the Bank placed Plaintiff in the drive-through at the Twin Peaks branch in April 2010 and refused to relocate her station to a desk in the lobby [#32-21 at 172:5-12; #32-22 at 4-5]; and (4) in May or June 2010, Ms. Baggus allegedly told Plaintiff that she was "selfish, ungrateful, hateful and the Bank did not have to hire [her] back."  [#32-20 at 78:4-16; #32-21 at 172:13-19; #32-22 at 4-5].[6]  The Bank argues that Ms. Anderson's claim for failure to accommodate is time-barred because Plaintiff did not file a charge of discrimination with the EEOC until April 2013.

The ADA requires a party to exhaust administrative remedies within 300 days or less of the alleged unlawful practice.  *See* 42 U.S.C. § 2000e-5(e)(1).  On April 22, 2013, Plaintiff timely filed her EEO complaint as to her claim for the October 15, 2012 unlawful termination. However, each discrete incident of allegedly discriminatory treatment constitutes its own "'unlawful employment practice' for which administrative remedies must be exhausted." *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (quoting *National Railroad Passenger*

*Corp. v. Morgan,* 536 U.S. 101 (2002) (abrogating the continuing violation doctrine as to claims of discriminatory or retaliatory action by employers such that a plaintiff is required to exhaust administrative remedies for each incident of violative treatment as a prerequisite to asserting a claim).   Following *Morgan*, the plaintiff is barred "from suing on claims for which no administrative remedy had been sought, when those incidents occurred more than 300 days *prior* to the filing of plaintiff's EEO complaint."   *Id.*

The denial of accommodation claim is supported by incidents that occurred prior to June 26, 2012, which is the latest date this court could consider based on the filing of the EEO complaint.   Plaintiff has administratively exhausted the claim for the October 15, 2012 termination only, and the EEO complaint cannot be construed as exhausting a claim for the Bank's purported failures to accommodate between August 2009 and June 2010.[7]

## CONCLUSION

For the forgoing reasons, IT IS ORDERED:

(1)   Defendant Guaranty Bank and Trust Co.'s Motion for Summary Judgment [#32] is GRANTED;

(2)   The Clerk of the Court shall enter judgment in favor of Defendant Guaranty Bank and Trust Co. and against Plaintiff Marie D. Anderson; and

(3)   Each Party shall bear her and its own costs and fees.

---

[6] Plaintiff admitted during her deposition that Ms. Baggus did not make the alleged comments to her because of any claimed disability.   [#32-21 at 186:3-7].

DATED:  October 9, 2015                    BY THE COURT:


                                           s/ Nina Y. Wang
                                           United States Magistrate Judge

---

[7] The Bank sets forth several additional arguments in the alternative as to each of Plaintiff's claims, which the court declines to reach based on the forgoing findings and conclusions of law.